# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 10, 2024 Session

## STATE OF TENNESSEE v. BRIAN TREMAINE MITCHELL

**Appeal from the Criminal Court for Davidson County**
**No. 2021-B-924      Steve R. Dozier, Judge**

_____

### No. M2023-00050-CCA-R3-CD

_____

The Defendant, Brian Tremaine Mitchell, was convicted in the Davidson County Criminal Court of two counts of first degree premeditated murder, one count of first degree felony murder, one count of attempted second degree murder, and employing a firearm during the commission of a dangerous felony and received a total effective sentence of two consecutive life terms plus seventeen years in confinement. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by admitting hearsay statements into evidence as dying declarations, (3) the trial court erred by failing to instruct the jury on the statements as dying declarations, (4) the trial court erred by refusing to suppress his Facebook records from evidence, (5) the trial court erred by allowing his jailhouse statements and internet searches into evidence, (6) the trial court erred by excluding evidence that one of the victims was selling drugs and might have been intoxicated at the time of the crimes, and (7) he is entitled to relief under the cumulative error doctrine. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, Jr., JJ., joined.

Will Allensworth (on appeal), Emma Rae Tennant (at oral arguments), and Jon Wing and Chad Hindman (at trial), Nashville, Tennessee, for the appellant, Brian Tremaine Mitchell.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jenny Charles, J. Wesley King, and Christina Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTS

This case relates to the shooting of Laquisha Terrell, who was seven months pregnant with the Defendant's child, and Michael Stewart, who was Ms. Terrell's boyfriend, on April 28, 2021. Doctors delivered Ms. Terrell's baby girl by emergency Cesarean-section, but Ms. Terrell and her baby did not survive.

In June 2021, the Davidson County Grand Jury returned a five-count indictment, charging the Defendant as follows: count one, first degree premeditated murder of Ms. Terrell; count two, first degree premeditated murder of Ms. Terrell's baby; count three, first degree felony murder of Ms. Terrell's baby committed during the perpetration of first degree premeditated murder of Ms. Terrell; count four, attempted first degree premeditated murder of Mr. Stewart; and count five, employing a firearm during the commission of a dangerous felony, i.e., the attempted first degree murder of Mr. Stewart. The Defendant went to trial in August 2022.

At trial, William Cobb testified that on the night of April 28, 2021, he was visiting his girlfriend at her apartment on Cedar Pointe Parkway. About 10:50 p.m., Mr. Cobb was sitting in his girlfriend's living room when he heard gunshots. He went outside and heard Mr. Stewart screaming. Mr. Stewart was "halfway" under a car in the parking lot and looked like he had been shot once or twice on his left side. He told Mr. Cobb to assist Ms. Terrell. Mr. Cobb went to Ms. Terrell, who was standing in the parking lot, and helped her lie down. She had been shot in her upper left thigh and appeared to have two or three gunshot wounds to her chest or stomach. Mr. Cobb retrieved a first aid kit from his car and began rendering aid to Ms. Terrell.

The State played for Mr. Cobb a video recorded inside his girlfriend's apartment on the night of the shooting. Mr. Cobb acknowledged that fifteen gunshots could be heard on the recording.

On cross-examination, Mr. Cobb testified that about one minute after the shooting, he looked outside and saw a Ford F-150 pickup truck. He then walked outside and found the victims. Mr. Cobb told the police about the truck.

Twenty-nine-year-old Michael Stewart testified that in April 2021, he was dating Ms. Terrell "off and on." Ms. Terrell had a daughter and was six or seven months pregnant with her second child. Mr. Stewart knew of the Defendant but had never seen him.

Mr. Stewart testified that on April 28, Ms. Terrell visited her mother in Lewisburg. That night, Mr. Stewart picked up Ms. Terrell at her mother's home and drove Ms. Terrell to her apartment complex, the Cedar Pointe Apartments, in Nashville. When they arrived

in the parking lot, Mr. Stewart backed his car into a parking space, and they began walking to Ms. Terrell's apartment. Ms. Terrell was carrying a cup of ice; Mr. Stewart was walking behind her and was carrying a bag of baby clothes. As they were walking up the steps to Ms. Terrell's second-floor apartment, an individual "just came out of nowhere" at the top of the steps and began shooting at them. Mr. Stewart described the shooter as young, thin, and a lighter-skinned African American male. Mr. Terrell said he looked the shooter "directly in his eyes" and "took off running."

Mr. Stewart testified that he ran to the parking lot and rolled under a car. The shooter came down the steps, looked to his right, looked to his left, and walked away. He did not say anything, and he did not try to take anything from Mr. Stewart or Ms. Terrell. Paramedics arrived and transported Mr. Stewart, who had been shot four or five times, to Vanderbilt Medical Center. Mr. Stewert underwent surgery, but one bullet was still in his chest at the time of trial. He was discharged from the hospital on April 30. On May 5, Detective Timothy Morgan interviewed Mr. Stewart and showed him a six-photograph array. Prior to viewing the array, Mr. Stewart told Detective Morgan that he had seen a photograph of the Defendant on the television news. Detective Morgan did not pressure Mr. Stewart to identify anyone in the array, and Mr. Stewart identified the Defendant as the shooter. The State asked Mr. Stewart how certain he was of his identification, and he said he was "100 percent sure." Mr. Stewart stated, "[I]t's by his eyes, like, that's how I knew. Because I looked him directly in his eyes when he shot[.]" Mr. Stewart also identified the Defendant in the courtroom as the shooter.

On cross-examination, Mr. Stewart testified that at the time of the shooting, he thought he was the biological father of Ms. Terrell's baby. He acknowledged that when he and Ms. Terrell arrived in the parking lot of the apartment complex, the area was dark. They began walking upstairs to the apartment, and Ms. Terrell was almost to the top step when the shooter appeared and began firing. Mr. Stewart acknowledged that the shooter aimed at them and fired "continuously." The shooter was wearing a dark blue bandana over the lower half of his face, which prevented Mr. Stewart from seeing his nose and mouth.

Mr. Stewart testified that after he was released from the hospital, his mother showed him a photograph of the Defendant on the news. Mr. Stewart had never seen the Defendant previously. When Detective Morgan later showed the six-photograph array to Mr. Stewart, Mr. Stewart knew that the police had arrested the Defendant and that the Defendant's photograph would be in the array. Mr. Stewart identified the Defendant in the array and told Detective Morgan that he recognized the Defendant's mustache and eyes.

Mr. Stewart acknowledged that the police found about six ounces of marijuana in Ms. Terrell's purse after the shooting. He said that he did not use marijuana, that he did

not know Ms. Terrell possessed marijuana, and that Ms. Terrell did not smoke marijuana on the day of the shooting.

Detective Joseph Chadwick High of the Metropolitan Nashville Police Department ("MNPD") and a member of the Surveillance and Investigative Support Unit, testified as an expert in call detail records analysis that he analyzed the call detail records for the Defendant's cellular telephone, with the number xxx-xxx-2293, for the night of April 28, 2021. The victims were shot at 10:50 p.m. at 1110 Cedar Pointe Parkway. From the call detail records, which showed the locations of cellular towers that communicated with the Defendant's telephone, Detective High was able to conclude that the Defendant's telephone was in the area of the Cedar Pointe Apartments at the time of the shooting. Moreover, the Defendant's telephone sent and received more than sixty text messages between 9:02 p.m. and 10:25 p.m., but the telephone did not send or receive any text messages between 10:25 and 10:55 p.m. On cross-examination, Detective High acknowledged that he could not determine the exact location of the telephone at the time of the shooting.

Officer Garrett Latham of the MNPD testified that he and his partner were the first responders to arrive at the scene of the shooting. Ms. Terrell was lying in the parking lot with several people standing around her, and she appeared to have been shot multiple times in her chest and left thigh. Blood was pooling around her body, and a man was rendering first aid. As Officer Latham approached Ms. Terrell, who was visibly pregnant, she said multiple times, "'[S]ave my baby, save my baby.'" Officer Latham began helping Ms. Terrell and asked bystanders if they saw what happened. Ms. Terrell interjected that "it was Brian." Officer Latham was wearing a purple latex glove and wrote "Brian" on the glove with a black ink pen. He asked Ms. Terrell for Brian's last name and date of birth, and she responded, "Mitchell" and "February 21, 1998." Officer Latham wrote the last name and the date on the glove. He later learned the Defendant's correct birthdate was January 21, 1998. Officer Latham asked Ms. Terrell "who [Brian Mitchell] was to her," and she said he was her "ex-boyfriend." An ambulance arrived and transported Ms. Terrell to the hospital.

On cross-examination, Officer Latham testified that he responded to the scene at 10:54 p.m. He acknowledged that Ms. Terrell was "seriously injured"; that she "seemed very frantic"; and that she was "slipping out of consciousness." Ms. Terrell told Officer Latham, "'It was Brian.'" She did not say, "'Brian shot me.'"

Candice Calil testified that in April 2021, she was living in a ground-floor apartment in the Cedar Pointe Apartments and that Ms. Terrell was her neighbor. About 10:50 p.m. on April 28, Ms. Calil was in her apartment when she heard "a noise, banging, like someone was banging on a door." She then heard "a rumble going down the steps"; gunshots; and

someone screaming, "'I'm pregnant.'" Ms. Calil looked out her window and saw a man with a small gun in his hand. The man had his back to her and was holding the gun behind his back. Ms. Calil described the man as African American with a slim build, cornrows in his hair, and "something that was knotted in the back of his head." She could not see his face. He was wearing khaki pants or shorts and a white t-shirt. He looked to the left, looked to the right, and ran to the right.

Ms. Calil testified that she dialed 9-1-1, walked outside, and followed a blood trail to Mr. Stewart, who was hiding underneath a car and shouting for help. Ms. Calil got towels from her apartment and put pressure on his wounds. She then went to Ms. Terrell, who was lying on the ground. Ms. Terrell was screaming and was "shouting of agony and pain." Ms. Terrell said, "'[C]all my mama, call my mama'" and told Ms. Calil the telephone number. Ms. Calil dialed the number and put the call on speakerphone. Ms. Calil heard Ms. Terrell tell her mother, "That [motherf*cker] shot me. That [motherf*cker] Brian Mitchell shot me."

Ms. Calil testified that later that night, she spoke with Detective Morgan. Initially, Ms. Calil denied telling Detective Morgan that Ms. Terrell identified the shooter as "Chris." However, Ms. Calil then said that she was sleeping when Detective Morgan came to her door and that she probably gave him the name "Chris." She explained,

> I did hear the name Chris and if I did say it to him, I woke up and I just heard so many names. But I did hear Brian Mitchell, and I didn't know if it was Chris Brian Mitchell, it was a full name complete.

Ms. Calil said she was "100 percent sure" Ms. Terrell identified the shooter as "Brian Mitchell."

Ms. Calil testified that she had seen the Defendant with Ms. Terrell prior to April 28, 2021. About two weeks before the shooting, Ms. Calil returned home from the grocery store and saw Ms. Terrell and the Defendant standing near a blue car in the parking lot. The Defendant tried to hug Ms. Terrell, but Ms. Terrell pushed him away. Ms. Calil asked Ms. Terrell if she was okay, and Ms. Terrell said yes.

On cross-examination, Ms. Calil testified that she never heard Ms. Terrell say "Chris" after the shooting. However, Ms. Calil heard someone at the scene say "Chris," so she thought the shooter's name was "Brian Chris Mitchell."

Latora Terrell testified that she was Laquisha Terrell's mother. They had a close relationship and spoke every day. On April 28, 2021, Laquisha was at Latora's home in

Lewisburg.[1]   Latora gave Laquisha a bag of baby clothes, and Laquisha returned to Nashville.  About 10:50 p.m., Laquisha telephoned Latora and said, "'Mom, help me.  Brian just shot me.'"  The Defendant was the only "Brian" in Laquisha's life, and Laquisha did not know anyone named "Chris."  Laquisha did not say "Chris" on the telephone.

Danielle Conner, a civilian crime scene investigator with the MNPD, testified that she arrived at the apartment complex soon after midnight to collect evidence.  Ms. Conner found fourteen forty-caliber Smith & Wesson bullet casings.  Six of the casings were on the landing at the top of the steps in building eleven, which was Ms. Terrell's apartment building, and five casings were on the steps.  Ms. Conner also collected a bag of baby clothes and a Styrofoam cup on the steps.  Three bullet strikes appeared to be in the ground at the bottom of the steps, and a shoeprint was in some mud on the sidewalk in front of the building.  Ms. Conner acknowledged that anyone could have left the shoeprint, including a police officer.  She found a pink purse and a black backpack at the scene.  A wallet and a jar containing a small amount of marijuana were in the backpack.  A blood trail went across the parking lot from the building, and blood stains were in the parking lot.

Detective Timothy Morgan of the MNPD testified that he was the lead detective for the shooting.  The first call to report the shooting was made at 10:50 p.m. on April 28, 2021; Detective Morgan was notified about the shooting at 12:30 a.m. on April 29; and he arrived at the scene at 1:38 a.m.  Police officers were unable to find a gun or mask.  They found Ms. Terrell's cellular telephone, but the telephone had been struck by a bullet and was inoperable.

Detective Morgan testified that he obtained video recorded by multiple cameras in the apartment complex.  The State played the video for the jury while Detective Morgan explained what was depicted in the video.  At 10:02 p.m., a blue Mustang with a black convertible top entered the apartment complex from Bell Road.  The Mustang continued through the parking lot and turned toward building six, which was across the parking lot from a dog park.  At 10:51 p.m., one minute after the shooting, a person wearing a light-colored shirt was seen running from the direction of the shooting and toward building six.  At 10:54 p.m., the Mustang reappeared and exited the apartment complex.  Detective Morgan stated that the Mustang "appear[ed] to leave the complex at a much more rapid pace than what it entered with."

Detective Morgan testified that at 11:46 a.m. on April 29, the police stopped and arrested the Defendant on Charlotte Pike.  He was driving a blue Mustang with a black convertible top, and his brother was in the car.  Detective Morgan later searched the

---

[1] Because the victim and her mother share a surname, we will briefly refer to them by their first names for clarity.  We mean no disrespect to the victim or the witness.

Mustang pursuant to a search warrant and found a white V-neck t-shirt, black pants, a blue or purple "durag," and a black durag in the trunk. He also collected two cellular telephones. Detective Morgan interviewed the Defendant about 12:45 p.m. At the time of the interview, Ms. Terrell and her baby were alive. The baby had been delivered by emergency Caesarean-section and was in the neonatal intensive care unit.

Detective Morgan video-recorded the Defendant's interview, and the State played the recording for the jury. During the interview, the Defendant stated that he was the manager of the Wingstop restaurant on Charlotte Pike and that he owned one car, a blue Mustang. His "baby mama" lived in the Cedar Pointe Apartments. The Defendant also had a girlfriend, but he was homeless and would sleep in his car. On the night of the shooting, the Defendant worked at Wingstop. He left the restaurant about 9:00 p.m., drove to the Cedar Pointe Apartments, and parked near the dog park to sleep in his car. He did not hear any gunshots and left the complex before midnight. He drove to Thorntons gas station, which was near the Wingstop on Charlotte Pike. He left Thorntons, drove to a liquor store, and drove to Wingstop. The Defendant later parked in a nearby apartment complex and slept in his car. The Defendant wanted to know what happened at the Cedar Pointe Apartments. Detective Morgan informed the Defendant that Ms. Terrell had been shot and that their baby "[was] not going to make it." The Defendant became very upset but was never tearful. He said he did not own a gun.

Detective Morgan testified that it would have taken the Defendant about twenty minutes to drive from the Cedar Pointe Apartments to Thorntons gas station. Video from Thorntons showed the Defendant arriving at 12:15 a.m. on April 29. Detective Morgan acknowledged that he did not know the Defendant's whereabouts from the time of the shooting until the Defendant arrived at Thorntons.

Detective Morgan testified that he spoke with Ms. Calil on the night of the shooting. When the police arrested the Defendant on the morning of April 29, his hairstyle matched Ms. Calil's description of the shooter's hairstyle. Detective Morgan interviewed the Defendant's brother and obtained a search warrant for the Defendant's Facebook records from April 23 to May 1, 2021. According to the records, at 8:51 a.m. on April 29, the Defendant contacted his brother via Facebook and asked "Wyd," meaning "What you doing[?]" The Defendant's brother answered, "Chillin'" and "I think I saw you . . . [o]n Anderson Road [like] an hour ago." The Defendant responded, "Let's talk" and "Fr Fr." Detective Morgan said that "Fr fr" meant "For real, for real." Detective Morgan acknowledged that part of Anderson Road ran parallel to Percy Priest Lake.

Detective Morgan testified that he interviewed Mr. Stewart on May 5, 2021, and that Mr. Stewart was extremely cooperative. Detective Morgan showed Mr. Stewart a six-photograph array containing the Defendant's photograph, and Mr. Stewart identified the

Defendant as the shooter. Prior to viewing the array, Mr. Stewart informed Detective Morgan that he had seen a photograph of the Defendant on the news. Therefore, Detective Morgan used a different photograph of the Defendant in the array. After Mr. Stewart selected the Defendant's photograph, Mr. Stewart wrote on the array, "I can tell by the mustache and his eyes." Mr. Stewart told Detective Morgan that he looked into the Defendant's eyes while the Defendant was shooting him.

On cross-examination, Detective Morgan acknowledged that no fingerprints or DNA linked the Defendant to the shooting. The police did not find any blood on the clothes that were in the Mustang, the police did not test the clothes for gunshot residue, and the police never found the gun that was used in the shooting. Detective Morgan obtained the Defendant's shoes and visually compared the soles of the shoes to the shoeprint found in front of building eleven; the soles did not match the shoeprint. Detective Morgan acknowledged that Ms. Calil never said "Brian Mitchell" was the shooter. Instead, Ms. Calil said that Ms. Terrell made a telephone call to Ms. Terrell's mother and that Ms. Terrell identified the shooter as "Chris."

Detective Morgan acknowledged that the Defendant worked at Wingstop on the night of the shooting and that multiple people could be seen on the apartment complex video walking in the area of the shooting prior to the shooting. When the Defendant arrived at Thorntons, he was wearing a black shirt and dark-colored pants, which did not match the description of the shooter's clothing. Detective Morgan acknowledged that the photograph of the Defendant that was on the news was similar to the photograph of the Defendant that was in the array. Specifically, both photographs showed the Defendant with the same facial hair. Moreover, although the shooter was wearing a bandana over the lower part of his face, Mr. Stewart said he identified the Defendant by the shooter's mustache and eyes. Detective Morgan acknowledged that Mr. Stewart could not have seen the shooter's mustache.

Investigator Chad Gish of the MNPD testified as an expert in digital forensics that he tried to access the data in the two cellular telephones found in the Mustang but that they were password protected. About one year later, Investigator Gish obtained software that enabled him to access the data in one of the telephones, the one with telephone number xxx-xxx-2293. From that data, Investigator Gish learned that on April 10, 2021, the Defendant conducted a Google search for the depth of Percy Priest Lake. The Defendant also searched for a depth map of the lake. On April 27, 2021, one day before the shooting, the Defendant typed a search into Google: "What can you eat to cause a miscarriage?" Google then provided suggested searches, and the Defendant selected "What can you eat to cause a miscarriage late in pregnancy."

Investigator Gish testified that he also was able to access the telephone's text messages. On April 14, 2021, someone sent the Defendant a text message that read, "But are you on your way to work?" The Defendant answered, "Yeah, stopped at a car wash. I'm cleaning out the car. I don't want nothing in it but my felony." The person responded, "[Y]ou have a felony." The Defendant answered, "Gun, open bottles, skates, yeah, I do, just haven't got caught up." Investigator Gish also found photographs in the telephone. One of the photographs showed the Defendant holding a pistol. Another photograph showed a pistol and an extended gun magazine with one round of ammunition in the magazine. The pistol and magazine appeared to be on the passenger seat of a vehicle.

Dr. Erin Carney, the Deputy Chief Medical Examiner for Davidson County, testified as an expert in forensic pathology that she conducted Ms. Terrell's autopsy. Dr. Miguel Laboy, an assistant chief medical examiner, conducted the autopsy on Ms. Terrell's baby. Ms. Terrell arrived at the hospital with seven gunshot entrance wounds to her chest, abdomen, left thigh, and the middle finger on her right hand. The bullets damaged her liver, stomach, and colon. Ms. Terrell also had gunshot wounds on her lower left leg. She began experiencing heavy vaginal bleeding, and her baby's heart rate was very low. Medical personnel quickly delivered her baby by Cesarean-section and operated on Ms. Terrell's wounds. Ms. Terrell developed an infection and died on May 11. She was able to see her baby prior to her death and learned her baby would not survive. After Ms. Terrell's death, medical personnel withdrew care for her baby. The baby died on May 12 of anoxic brain injury due to the amount of blood lost by Ms. Terrell after the shooting. The baby was thirty-one weeks gestation and weighed just over three pounds at the time of delivery, and her prematurity contributed to her death. Dr. Carney concluded that Ms. Terrell's cause of death was complications from her gunshot wounds and that her manner of death was homicide. Her baby's manner of death was homicide.

Linda Griffin, the Chief Investigator for the Davidson County Sheriff's Office, testified that her job responsibilities included listening to jailhouse telephone calls. Investigator Griffin identified an audio-recorded call placed by the Defendant on May 14, 2021. The State played the call for the jury and introduced a transcript of the call into evidence:

> [The Defendant]: What's up bro?
>
> Unknown male: I heard what you did to your baby momma when you caught her cheating.
>
> [The Defendant]: Uh, what they call that? Uh, love passion or . . .
>
> Unknown male: Love, love crime.

[The Defendant]:  Love crime.

Unknown male:  Inaudible.

[The Defendant]:  That's exactly um, man bro, that's what they say.

(Laughter in the background.)

[The Defendant]:  Mmmm, hmmm.  Yeah, you don't want to [f*ck] with nobody who loves you.  Love makes you do some crazy things.  Dude asked me like bro what the heck, what, what did you do to your baby's momma.  Laughter.  He was like listen to this.  That's what's going to happen if you ever cheat on me.  Laughter.

Unknown female:  Oh Lord.

[The Defendant]:  Yeah.  All I said, that's what they said I did.

Unknown female:  Right.  Everybody talking a whole lot of [sh*t].  [F*ck] them.

[The Defendant]:  Sighs.  It's all good though.  Laughs.  I'm the baddest [motherf*cker] in here.

Uknown female:  Laughs.  You're funny.

[The Defendant]:  No, I'm serious though.

Unknown female:  I bet.

[The Defendant]:  Go hard or go home.

Mackenzie Matney, a forensic scientist with the MNPD, testified as an expert in serology that she examined and analyzed four items of clothing found in the Mustang for blood:  Two durags, a t-shirt, and a pair of sweatpants.  All the items were negative for blood.

The State recalled Mr. Stewart to the stand and played part of a 911 call that was recorded on the night of the shooting.  Mr. Stewart acknowledged that a woman's voice could be heard in the background.  He identified the voice as that of Ms. Terrell and said

that Ms. Terrell could be heard saying "Brian Mitchell." At the conclusion of Mr. Stewart's testimony, the State rested its case.

Chaka Miller testified that her brother owned two local Wingstops, that she was a manager at his Wingstop on Charlotte Pike, and that the Defendant worked for her family for five or six years. The Defendant started as a cook for the Wingstop on Charlotte Pike and became a manager. On the night of April 28, 2021, Ms. Miller was working at the restaurant. The Defendant arrived between 11:00 and 11:45 p.m. Ms. Miller said it was not unusual for him to show up at that time of night to help her close the restaurant at midnight. The Defendant was driving his blue Mustang and was wearing a multi-colored shirt and black jeans. He was laughing and talking with other employees and did not seem nervous or angry. After Ms. Miller closed the restaurant, she drove across the street to Thorntons. The Defendant followed her in his Mustang. Ms. Miller bought gasoline at Thorntons, and she and the Defendant parted ways.

Deidre Dupee, the Defendant's aunt, testified that at the time of the shooting, she was living with her sister, who was the Defendant's mother, in the area of Percy Priest Lake. The Defendant was not living with them, but Ms. Dupee saw him regularly. Ms. Dupee last saw the Defendant two or three days before the shooting. He was very tired, but he was not angry or upset.

Dr. Jerry Neuschatz, a cognitive psychologist, testified as an expert in eyewitness identification that he reviewed the police reports and the photograph array shown to Mr. Stewart. Detective Morgan video-recorded Mr. Stewart when Mr. Stewart viewed the array, and Dr. Neuschatz reviewed the recording. Dr. Neuschatz said that he never spoke with Mr. Stewart or the Defendant and that he was being paid $75 to $150 per hour for his work on this case. He stated that the purpose of his testimony was to discuss factors that the jury should consider in evaluating the accuracy of Mr. Stewart's eyewitness identification, not to say that Mr. Stewart's identification was inaccurate.

Dr. Neuschatz testified that people sometimes filled gaps in their memory with information that could be accurate or inaccurate. A person's confidence in an identification was not always related to the accuracy of the identification. In other words, a person could be one hundred percent sure of an identification and still choose the wrong perpetrator. Exposure time, i.e., the amount of time a person was able to see an incident, affected accuracy: The less exposure time, the more difficulty in remembering the incident accurately. Likewise, the retention interval, i.e., the amount of time between exposure to the event and testing on the event, affected accuracy. In this case, Mr. Stewart's exposure time, the amount of time he saw the shooting, was "short." His retention interval, the amount of time between the shooting and his viewing the photograph array, was seven days, which was "long." Dr. Neuschatz explained that for an event with a short exposure

- 11 -

time and a long retention interval, "there are more things that can intervene and make it harder to remember things accurately. . . . In the case of eyewitness identification, it would make it harder to make an accurate identification."

Dr. Neuschatz testified that stress, such as stress caused by a shooting, also could make an accurate identification more difficult. Dr. Neuschatz stated that when a perpetrator used a weapon, such as in this case, victims tended to look at the weapon rather than the perpetrator. A perpetrator's covering part of the face also could affect accuracy.

Dr. Neuschatz testified that in-court identifications were very biased and suggestive because they did not include the same precautionary instructions given by police during lineups. In this case, Mr. Stewart knew when he viewed the photograph array that the Defendant had been arrested; therefore, Mr. Stewart expected the Defendant's photograph to be in the array. Mr. Stewart also saw an "intervening" photograph of the Defendant prior to viewing the array, which jeopardized the reliability of Mr. Stewart's identification and made him more likely to choose the Defendant's photograph. Dr. Neuschatz noted that the shooter was wearing a bandana over the lower part of his face. Therefore, Mr. Stewart could not have seen the shooter's mustache. Dr. Neuschatz said that Mr. Stewart's statement about the mustache resulted from his constructing what he knew about the Defendant or the intervening photograph.

On cross-examination, Dr. Neuschatz estimated that he was going to earn about $3,000 from his work on this case. He acknowledged that Detective Morgan's decision to video-record Mr. Stewart viewing the photograph array was "the right thing" to do. He also acknowledged that Detective Morgan did not have any control over Mr. Stewart's seeing the intervening photograph and that Detective Morgan followed the proper procedures for showing a lineup to an eyewitness. Dr. Neuschatz acknowledged that he could not say the Defendant was not the shooter or that Mr. Stewart misidentified the Defendant.

Makayla Bailey testified that in April 2021, she was living in building eleven of the Cedar Pointe Apartments. Her apartment was upstairs, across the breezeway from Ms. Terrell's apartment. On the night of April 28, Ms. Bailey heard "loud banging" on her door. She also heard her doorknob twisting, like someone was trying to get into her apartment. Ms. Bailey telephoned the police but did not go outside until they arrived. She said that prior to April 28, she would see the Defendant's Blue Mustang parked at the apartment complex two or three days per week. However, she never saw the Defendant. On cross-examination, Ms. Bailey acknowledged that the loud banging she heard could have been gunshots.

At the conclusion of the proof, the jury convicted the Defendant of two counts of first degree premeditated murder and one count of first degree felony murder as charged in the indictment. The jury also found him guilty of attempted second degree murder as a lesser-included offense of the attempted first degree murder of Mr. Stewart and guilty of employing a firearm during the commission of attempted second degree murder. The trial court immediately sentenced the Defendant to life for first degree murder in counts one, two, and three and merged counts two and three. After a sentencing hearing, the trial court sentenced him as a Range I, standard offender to eleven years for attempted second degree murder, a Class B felony, and six years for employing a firearm during the commission of a dangerous felony, a Class C felony, and ordered that he serve all of the sentences consecutively for a total effective sentence of two consecutive life terms plus seventeen years in confinement.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his convictions because the proof fails to establish his identity as the shooter. In support of his claim, he notes that the State failed to present any forensic proof linking him to the crimes, such as his fingerprints on the bullet casings found at the scene or the victims' blood on his clothes. He also asserts that the victims' identifications of him were "problematic" in that (1) Ms. Calil claimed on the night of the shooting that Ms. Terrell identified the shooter as "Chris" and (2) Mr. Stewart saw a photograph of him prior to viewing the photograph array. The State argues that the evidence is more than sufficient to support the convictions. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes

the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Relevant to this case, first degree murder is the premeditated and intentional killing of another or the killing of another committed in the perpetration of any first degree murder. Tenn. Code Ann. § 39-13-202(a)(1), (2). Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). It is an offense for a person to employ a firearm during the commission of a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1). Attempted second degree murder is a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(B).

Taken in the light most favorable to the State, the evidence established that Ms. Terrell and Mr. Stewart were ambushed and shot repeatedly as they were walking up the steps to Ms. Terrell's apartment. About forty minutes before the shooting, video cameras captured the Defendant, who was the father of Ms. Terrell's unborn child, arrive at Ms. Terrell's apartment complex and drive toward building six. In the minutes after the shooting, the cameras recorded someone wearing clothing similar to the shooter's clothing run from the area of the shooting and toward building six. The cameras then captured the Defendant's Mustang quickly leave the apartment complex. Just one day before the shooting, the Defendant had searched the internet for a way to cause a miscarriage.

Ms. Terrell told Officer Latham that the Defendant was the shooter, and Ms. Calil heard Ms. Terrell tell her mother that the shooter was "Brian Mitchell." Although Ms. Calil acknowledged that she may have told Detective Morgan that Ms. Terrell identified the shooter as "Chris," Ms. Calil explained to the jury that she heard someone, but not Ms. Terrell, say "Chris." Mr. Stewart also identified the Defendant as the shooter in a photograph array seven days after the shooting. The Defendant admitted to Detective Morgan that he was at the apartment complex at the time of the shooting, and Detective Morgan noticed that the Defendant's hairstyle matched Ms. Calil's description of the shooter's hairstyle. Although the Defendant claimed he had never owned a gun,

Investigator Gish found a photograph of the Defendant holding a gun and text messages in which the Defendant referred to having a gun. Less than one month after the shooting, an unidentified male was recorded telling the Defendant, "I heard what you did to your baby momma when you caught her cheating." Not only did the Defendant not deny shooting Ms. Terrell, but he also made statements a reasonable jury could infer as bragging about shooting her. The jury evaluated the credibility of the witnesses and resolved any conflicting testimony in favor of the State. We agree with the State that the evidence is more than sufficient to support the convictions.

## II. Dying Declarations

The Defendant claims that the trial court erred by admitting Ms. Terrell's hearsay statements to Officer Latham, in which she identified the Defendant as the shooter, into evidence because (1) the statements did not satisfy the elements of the dying declaration exception to the hearsay rule and (2) the statements were testimonial and, therefore, violated the Confrontation Clause. The State argues the trial court properly admitted the statements into evidence. We agree with the State.

Before trial, the Defendant filed a motion to exclude the statements Ms. Terrell made at the scene because the statements were testimonial, hearsay, and did not qualify for admission under any exception to the hearsay rule. The Defendant acknowledged that Ms. Terrell was seriously injured when she made the statements but claimed that the statements were not dying declarations because the circumstances did not show she was certain her death was imminent. In support of his claim, the Defendant noted that Ms. Terrell was able to tell first responders to save her baby's life, that she was able to answer Officer Latham's questions, and that she was able to make a telephone call to her mother. The Defendant also argued that the hearsay statements were not excited utterances because the startling event had ended by the time Ms. Terrell made her statements.

During a hearing on the motion, Officer Latham testified that Ms. Terrell was lying on the ground in the parking lot when he arrived. Blood was pooling around her body and was "coming through different portions of her clothing." He said that based on the amount of blood she had lost and her mental state, "it seemed like she could have been going into . . . possibly shock, like an altered state of mind." Ms. Terrell's breathing was "[v]ery rapid," and she said multiple times, "'[S]ave my baby, save my baby.'" Her eyes were open, but she was closing them in pain. Officer Latham asked the people standing around her if they had a description of the shooter. Even though he did not direct the question to Ms. Terrell, she said that "it was Brian." Officer Latham was certain Ms. Terrell said the name "Brian."

Officer Latham testified that he wrote "Brian" on the purple latex glove he was wearing. He asked Ms. Terrell for Brian's last name and date of birth, and he wrote her responses of "Mitchell" and "February 21, 1998" on his glove. The State asked why Officer Latham asked her those questions, and he said that he was "trying to save a life" and "get a suspect description out to the other officers that were coming on scene" so they could apprehend a suspect. The State introduced some of Ms. Terrell's medical records and her autopsy report into evidence.

On cross-examination, Officer Latham acknowledged that Ms. Terrell understood his questions and was able to respond to them. He asked how far along she was in her pregnancy, and she answered, "7 months." Officer Latham said that Ms. Terrell was not slurring her words but that "you could tell that she was in a lot of pain and she was scared of the outcome." He acknowledged that he obtained the Defendant's name for investigative purposes but said that he did not personally broadcast the Defendant's name over the radio.

At the conclusion of the hearing, the trial court asked Officer Latham what he meant when he said that Ms. Terrell was "scared of the outcome." Officer Latham answered,

> So, I said scared of the outcome because the first thing the first thing that she said to me when I got on the scene was "save my baby."
>
> . . . .
>
> I based that phrase on the fact that she thought that she wasn't going to be able to make it out and she wanted her kid to at least make it out.

The trial court entered a written order denying the Defendant's motion to exclude Ms. Terrell's statements. In its order, the trial court recalled Officer Latham's testimony that Ms. Terrell had been shot multiple times, was lying in a pool of blood, appeared to be going into shock, was breathing very rapidly, and was closing her eyes in pain. The court also recalled that Officer Latham asked Ms. Terrell questions after she interjected the statement "it was Brian" and that the purpose of the officer's questions was to obtain information so that the police could apprehend a suspect.

The trial court first addressed whether Ms. Terrell's statements "save my baby, save my baby," "please don't let me die,"[2] and "it was Brian" were admissible as dying

---

[2] According to a footnote in the trial court's order, the trial court did not hear Officer Latham testify about the statement "please don't let me die," but the statement was quoted in the Defendant's motion to exclude. In the Defendant's appellate brief, he states that "[t]he defense's motion to exclude Ms. Terrell's

declarations. The trial court said that Ms. Terrell's statements about saving her baby "could be differently construed depending on the context." However, the court stated that it was going to consider the statements under the circumstances in which Ms. Terrell made them: "bleeding out in a parking lot, slipping in and out of consciousness, frantic, and in a 'shock'-like mental state." The court concluded, "Under the described circumstances, the Court finds it reasonable that the victim's statements were made with the belief she was dying." The trial court found that Ms. Terrell's statements were admissible under the dying declaration exception to the hearsay rule and, therefore, did not address whether the statements were testimonial. The trial court also concluded that Ms. Terrell's statements were admissible under the excited utterance exception to the hearsay rule.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. The parties do not contest, and we agree, that Ms. Terrell's statements were hearsay.

In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. "Currently, *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny are the controlling authority for determining whether the admission of hearsay violates a defendant's rights under the federal confrontation clause, and [our supreme court] has applied *Crawford* to challenges under the Tennessee Constitution, as well." *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011). Generally, *Crawford* "bars the admission of testimonial hearsay absent a showing of unavailability and a prior opportunity for cross-examination." *State v. Lewis*, 235 S.W.3d 136, 146 (Tenn. 2007). A description of past events to investigating law enforcement officers is testimonial; however, statements are nontestimonial "when circumstances indicate that they are designed to 'enable police assistance to meet an ongoing emergency.'" *Id*. (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). Our supreme court has provided the following list of non-exclusive factors to consider when deciding whether a statement is "testimonial":

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the

statements inaccurately claimed that Officer Latham testified at the preliminary hearing that Ms. Terrell said, 'please don't let me die.'"

declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

*Parker*, 350 S.W.3d at 898-99 (quoting *State v. Franklin*, 308 S.W.3d 799, 813 (Tenn. 2010)). Whether the admission of hearsay statements violated a defendant's right to confrontation is a question of law. *Lewis*, 235 S.W.3d at 141. Application of the law to the facts found by the trial court is a question of law that we review de novo. *Id*. at 142.

Tennessee Rule of Evidence 804(b)(2) provides an exception to the hearsay rule for "dying declarations." The Rule states, "In a prosecution for homicide . . . , a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death" is admissible. Tenn. R. Evid. 804(b)(2). A dying declaration has the following five elements:

(1) The declarant must be dead at the time of the trial;

(2) the statement is admissible only in the prosecution of a criminal homicide;

(3) the declarant must be the victim of the homicide;

(4) the statement must concern the cause or the circumstances of the death; and

(5) the declarant must have made the statement under the belief that death was imminent.

*Lewis*, 235 S.W.3d at 149. As noted by the Defendant, "[a]wareness of impending death may be inferred from the facts and circumstances; the language and condition of the declarant; and the seriousness of the wounds." *State v. Branam*, 604 S.W.2d 892, 895 (Tenn. Crim. App. 1980) (internal citations omitted).

Whether facts show that hearsay statements were admissible under an exception to the hearsay rule is a question of law that we review de novo. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). Because dying declarations are "deeply entrenched in the legal history of this state," they are admissible even if they are testimonial. *Lewis*, 235 S.W.3d at 148.

Initially, the State contends that the Defendant has waived his Confrontation Clause claim because he failed to include it in his appellate brief's Statement of Issues Presented for Review as required by Tennessee Rule of Appellate Procedure 27(a)(4). However, the Defendant raised the issue in the trial court and thoroughly briefed the issue on appeal. Therefore, we refuse to find the issue waived.

Turning to whether the hearsay statements violated the Confrontation Clause, Officer Latham asked bystanders, not Ms. Terrell, if they could describe the shooter, and Ms. Terrell interjected that the shooter was "Brian." She then answered Officer Latham's questions, telling him that the Defendant was her ex-boyfriend and providing his last name and birthdate, which was only incorrect by one month. The victim made her statements as she was lying in the parking lot, bleeding excessively, and receiving medical aid. The situation was an ongoing emergency in which the armed perpetrator was still at large, and Officer Latham testified that he was trying to obtain information about the shooter so that officers could apprehend a suspect. Under those circumstances, we conclude that the statements were nontestimonial.

As to the trial court's ruling that Ms. Terrell's hearsay statements were admissible under the dying declaration exception to the hearsay rule, the Defendant is challenging only the fifth element, that the declarant must have made the statements under the belief that death was imminent. Ms. Terrell had been shot seven times. She repeatedly said to Officer Latham, "Save my baby, save my baby." While the trial court recognized that Ms. Terrell's saying "save my baby" could be interpreted differently regarding what she believed about her death, the court stated that it was going to construe her statements under the circumstances at the time she made them: bleeding out in a parking lot, slipping in and out of consciousness, frantic, and in a shock-like mental state. We conclude that based on those facts and circumstances, it could be inferred that Ms. Terrell believed her death was imminent. *See State v. Taylor*, No. W2020-00437-CCA-R3-CD, 2021 WL 1546077, at *14 (Tenn. Crim. App. Apr. 20, 2021) (concluding that trial court did not err by admitting statements as dying declarations when evidence showed that victim had been shot four times, was in shock, was having trouble breathing, was bleeding, and was fading in and out of consciousness). Thus, her statements to Officer Latham, identifying the Defendant as the shooter, qualified as dying declarations.

In any event, the trial court found that Ms. Terrell's statements also were admissible under the excited utterance exception to the hearsay rule, and the Defendant does not contest that ruling. Additionally, Ms. Calil and Ms. Terrell's mother both testified that they heard Ms. Terrell identify the Defendant as the shooter, and the Defendant does not challenge the admissibility of their testimony. Therefore, he is not entitled to relief. *See* Tenn. R. App. P. 36(b).

# III.  Dying Declaration Instruction

In a related argument, the Defendant claims that the trial court erred by failing to instruct the jury on Ms. Terrell's statements as dying declarations.  The State asserts that the Defendant has waived this issue because he failed to include it in his motion for new trial.  The Defendant requests that we review the issue for plain error.  We conclude that he is not entitled to plain error relief.

Tennessee Pattern Jury Instruction 42.15 provides a lengthy instruction on how a jury is to consider dying declarations.  For example, part of the instruction provides:

> This testimony comes to you through others, and it is not to be considered as if the deceased had appeared at this trial and testified as did other witnesses.  The deceased is not in condition, frequently, to give calm attention to the question to which [she] makes [her] statement.  You should take into consideration the reasonableness or unreasonableness of the statements allegedly made by the deceased; the contradictions, if any, by [her] interest or lack of interest, [her] intelligence, and [her] position and situation to know the facts.  You should bear in mind that the defendant was not present when the declaration was allegedly made and had neither the opportunity to make suggestions, nor call attention to the circumstances in [his] favor, nor to cross-examine to show inaccuracies of memory, nor expose bias from passion or prejudice.  For these reasons, this evidence should be received by you with caution.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.15.  The trial court is to instruct the jury on the weight the jury is to give the declarant's dying declaration, even when the defendant does not request the instruction.  *Branam*, 604 S.W.2d at 895.  When the trial court fails to provide the instruction, evidence in the record supporting the veracity of the declarant's dying declaration may render the error harmless.  *Taylor*, 2021 WL 1546077, at *17.

The defendant also waives the issue absent plain error if the defendant fails to raise the issue in the motion for new trial.  *Id.*  We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Additionally, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

The trial court erred by failing to instruct the jury on Ms. Terrell's statements as dying declarations. However, he is not entitled to relief. The Defendant admitted being in the apartment complex at the time of the shooting. After the shooting, video cameras captured an individual wearing clothing similar to that of the shooter running from the area of the shooting to the area where the Defendant had parked his car and captured the Defendant quickly driving out of the apartment complex. The Defendant's hairstyle matched the shooter's hairstyle, the Defendant lied to Detective Morgan about possessing a gun, and Mr. Stewart identified the Defendant as the shooter. During a jailhouse telephone call a month after the shooting, the Defendant made statements that were tantamount to an admission of guilt. In short, the proof of the Defendant's guilt was overwhelming. Furthermore, the statement of the victim identifying the Defendant also was also admitted under the excited utterance exception to hearsay and the Defendant does not raise that issue on appeal. Since the evidence was admitted under an alternative theory, any error regarding the jury instruction did not rise to a level that "probably changed the outcome of the trial." Thus, he is not entitled to plain error relief.

## IV. Facebook Records

The Defendant claims that the trial court erred by denying his motion to suppress his Facebook records because the affidavit in support of the search warrant did not establish a nexus between the shooting and his Facebook account. The State argues that the trial court properly admitted the records into evidence and that, in any event, any error was harmless. We agree with the Defendant that the trial court erred, but we also agree with the State that the error was harmless.

As part of his investigation, Detective Morgan obtained a search warrant on June 10, 2021, for the Defendant's Facebook account for the timeframe of April 23, 2021, through May 1, 2021. Before trial, the Defendant filed a motion to suppress his Facebook records, claiming that the affidavit in support of the warrant did not establish probable cause because the affidavit did not show a nexus between the crimes and the place to be searched. The Defendant attached Detective Morgan's affidavit to the motion.

In the affidavit, Detective Morgan briefly recounted the facts of the shooting. Those facts included that Ms. Terrell told Officer Latham the Defendant was the shooter, that the Defendant admitted being in the Cedar Pointe Apartments at the time of the shooting, and

that the Defendant said he thought he was using his telephone about the time of the shooting. The affidavit then provided, in relevant part, as follows:

[The Defendant] stated in his interview that he was contacted by his brother via Facebook the morning of 04/29/2021, and that he arranged to meet his brother via Facebook the morning of 04/29/21. When [the Defendant] was arrested on 04/29/2021 he was accompanied by his brother. [The Defendant] also stated in his interview that he began dating a new girlfriend on or around April 23[], 2021, and that Ms. Terrell was not happy about this fact. [The Defendant] also stated that Ms. Terrell had told him that the child she was pregnant with belonged to [the Defendant]. [The Defendant] advised that he had been staying in his car in the parking lot of Cedar Pointe Apartments, and that Ms. Terrell had told him to stop doing so.

On Monday 05/03/2021 at [12:34] PM, your affiant interviewed Laquisha Terrell at Vanderbilt hospital. She stated that Brian Mitchell shot her and that she wished she had her phone to show the detective the communications between her and [the Defendant]. Ms. Terrell's phone was destroyed in the shooting. Ms. Terrell told the detective she and Brian Mitchell had been texting about her new boyfriend Michael Stewart. According to Ms. Terrell, [the Defendant] communicated to her that she should have gotten rid of her baby and previously threatened to shoot her.

Your affiant has learned through training and experience that social media accounts such as Facebook are becoming a more popular means of communication than standard telephone and Internet communication platforms. Facebook accounts are free of charge and are accessible with a valid internet connection on mobile and desktop devices. With the growing availability of broadband Internet access and free Wi-Fi Internet connectivity, these accounts can be accessed by users for free or at a cost less than standard telephone services. Users can also send and receive media files with their communication, retain this information on their account, and do so without having to provide their real name or contact information, which makes these platforms popular with individuals involved in criminal dealings. Users also have the ability to select specific information they're able to share with specific account holders, which makes these accounts even more popular with individuals involved in criminal dealings by providing additional security to their message traffic. Your affiant has learned through previous investigations the value of data obtained from these accounts as they have provided me with information regarding the identity of criminal suspects, elements of proof and evidence regarding their crimes, their

motives for committing these crimes, and where they can be generally located.

During a suppression hearing, the State argued that Detective Morgan established a sufficient nexus between the Defendant's Facebook account and the crimes because the Defendant admitted that he used Facebook to contact his brother the day after the shooting. The trial court entered a written order denying the motion to suppress, stating that "Det. Morgan went into significant detail as to what records he sought and his reasonable belief that incriminating information would be found there." The court found that the affidavit "connected the cell phone, Defendant, and the alleged crime" and that the affidavit "established an adequate nexus between the evidence sought and the place to be searched."

At trial, Detective Morgan testified about the messages that the Defendant and his brother exchanged on Facebook the morning after the shooting. The State introduced the messages into evidence. During closing arguments, the State asserted:

> We know from the Facebook messages to his brother that [the Defendant] initiated contact with him that morning. He wanted to talk to his brother, quote, for real, for real. We don't know what he wanted to talk to him about with him, but whatever that topic, it warranted two for reals.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *See id*. However, "when a trial court's findings of fact at a suppression hearing are based on evidence that does not involve issues of credibility, a reviewing court must examine the record de novo without a presumption of correctness." *State v. Binnette*, 33 S.W. 3d 215, 217 (Tenn. 2000) (footnote omitted). The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn.1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures. Our supreme court has stated:

> The Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued except upon probable cause. Probable cause has been defined as a reasonable ground for suspicion, supported by circumstances indicative of an illegal act.

*Id*. at 294 (footnote and citations omitted).

"[A] finding of probable cause supporting issuance of a search warrant must be based upon evidence included in a written and sworn affidavit." *Id*. The issuing judge uses a totality-of-the-circumstances analysis to determine whether the affidavit establishes probable cause. *State v. Tuttle*, 515 S.W.3d 282, 305 (Tenn. 2017). In examining the affidavit, this court's standard of review is limited to whether the issuing magistrate had "'a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" *Id*. at 299 (quoting *State v. Jacumin*, 778 S.W.2d 430, 432 (Tenn. 1989). We note that "'affidavits must be looked at and read in a commonsense and practical manner', and . . . the finding of probable cause by the issuing magistrate is entitled to great deference." *State v. Bryan*, 769 S.W.2d 208, 211 (Tenn. 1989) (quoting *State v. Melson*, 638 S.W.2d 342, 357 (Tenn. 1982)).

"[T]he affidavit must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Tuttle*, 515 S.W.3d at 300 (citing *State v. Saine*, 297, S.W.3d 199, 206 (Tenn. 2009)). The nexus "'may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence.'" *Id*. at 301 (quoting *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993)). Additionally, courts should "'consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" *Saine*, 297 S.W.3d at 206 (quoting *State v. Reid*, 91 S.W.3d 247, 275 (Tenn. 2002)).

Turning to the instant case, we initially note that the trial court stated in its order denying the motion to suppress that the affidavit established a nexus between the Defendant's cellular telephone and the crimes but that the trial court did not state that the affidavit established a nexus between the Defendant's Facebook account and the crimes.

- 24 -

The affidavit provided details about the crimes and Detective Morgan's investigation. Significantly, Detective Morgan learned from the Defendant that Ms. Terrell was not happy about the Defendant having a new girlfriend and that Ms. Terrell had told the Defendant to stop parking in her apartment complex. Detective Morgan learned from Ms. Terrell that she and the Defendant had been texting about Mr. Stewart and that the Defendant had "communicated to [Ms. Terrell] that she should have gotten rid of her baby and previously threatened to shoot her." However, the affidavit did not provide any facts or evidence to show that Ms. Terrell and the Defendant ever communicated via Facebook. Likewise, while the affidavit provided that the Defendant used his cellular telephone at or near the time of the crimes, the affidavit did not provide that he did so to access Facebook. The only factual basis in the affidavit regarding Facebook was the statement that the Defendant's brother contacted him via Facebook on the morning after the shooting and that they arranged to meet via Facebook.

If an affidavit does not contain direct evidence of a nexus, as in this case, then "[w]e must . . . determine whether it was reasonable for the magistrate to infer that the items of contraband listed in [the] affidavit would be located" in the place to be searched. *Saine*, 297 S.W.3d at 206. On appeal, the State argues that it was reasonable to infer, from the facts about the shooting and Detective Morgan's statement that he had discovered valuable information about previous crimes on Facebook, that the Defendant may have divulged information about the shooting to his brother on Facebook. We disagree. In *Saine*, our supreme court found that an affidavit, stating that officers had observed the defendant leave his residence to go to a prearranged location to sell drugs to an informant and immediately return to his residence, could lead a magistrate reasonably to infer that drugs were located in the defendant's residence. *Id*. at 206. The court concluded that the inference was further supported by the officer stating in the affidavit that, in his experience, "drug dealers ordinarily keep their drugs, the proceeds of drug sales, and financial records related to their business in their residences." *Id*. Unlike *Saine*, though, we fail to see how the Defendant's use of Facebook the morning after the shooting to arrange a meeting with his brother, with nothing more about the Defendant's use of Facebook, could lead a magistrate reasonably to infer that the Defendant's Facebook account contained information about the shooting. To the contrary, the Defendant's requesting to talk with his brother in person about something important supports an inference that he would not use Facebook to talk about the crimes. Accordingly, we conclude that the affidavit did not provide a substantial basis to conclude from the totality of the circumstances that a search warrant would uncover evidence of wrongdoing from the Defendant's Facebook account.

Although probable cause did not exist for the warrant, we agree with the State that admission of the improper evidence was harmless beyond a reasonable doubt. The improperly admitted evidence of the Defendant communicating with his brother was not particularly prejudicial, and, as explained above, the proof of the Defendant's guilt was

- 25 -

overwhelming. *See* Tenn. R. App. P. 36(b). Therefore, we conclude that he is not entitled to relief.

## V. Jailhouse Telephone Call and Internet Searches

Next, the Defendant claims that the trial court erred by denying his motions in limine to prohibit the introduction of his jailhouse telephone call and internet searches into evidence. The Defendant claims that the telephone call and the internet searches were irrelevant. The State argues that the telephone call was highly probative of the Defendant's guilt and that the internet searches were relevant to show he intended to kill Ms. Terrell and her baby. We agree that the evidence was relevant to the State's case.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevance of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *Franklin*, 308 S.W.3d at 809 (citing *Lewis*, 235 S.W.3d at 141).

Regarding the jailhouse telephone call, the proof at trial showed that although the Defendant was the father of Ms. Terrell's baby, Ms. Terrell was dating Mr. Stewart at the time of the shooting. During the call, an unidentified male said, "I heard what you did to your baby momma when you caught her cheating." The Defendant responded, "Uh, what they call that? Uh, love passion[.]" The Defendant also stated, "Love makes you do some crazy things" and "That's what's going to happen if you ever cheat on me." Although the Defendant's statements spurred laughter from an unidentified woman on the call, the Defendant said, "I'm serious though." The Defendant's statements about cheating and his failure to denying harming Ms. Terrell were highly relevant to establish his identity as the shooter and his motive. Moreover, although the Defendant's statements were prejudicial, we agree with the trial court that their probative value was not substantially outweighed by the danger of unfair prejudice.

As to the internet searches, we also agree with the trial court that the evidence was relevant to the State's case. In April 2021, the month prior to the shooting, the Defendant searched Google for information about the depth of Percy Priest Lake. Just one day prior to the shooting, he searched, "[W]hat can you eat to cause a miscarriage late in pregnancy?" During closing arguments, the prosecutor stated,

We begin with a Google search of the Percy Priest Lake depth maps on 04/10 of 2021. Yes, that's in close proximity to the . . . Pheasant Creek Court address that [the Defendant's] mother lived at, and it is also in close proximity to Laquisha Terrell's apartment complex.

We then shift to 04/27 of 2021. At 1:23 a.m., [the Defendant] was searching what can you eat to cause a miscarriage late in pregnancy. The search was done a day before Ms. Terrell was killed on 04/28 of '21. Do you know who Googles foods that cause miscarriage? Expectant mothers. And they probably, not always, but probably do it in the early stages of their pregnancy when they're trying to figure out which foods to avoid. Not at seven months.

The State was required to prove beyond a reasonable doubt that the Defendant intentionally and with premeditation killed Ms. Terrell and her baby. The fact that the Defendant was looking for information on the depth of a lake near Ms. Terrell's home and how to cause her to have a miscarriage were highly relevant to the issues of intent, premeditation, identity, and motive. Additionally, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Accordingly, we conclude that the Defendant is not entitled to relief.

## VI. Ms. Terrell's Drug Sales and Possible Intoxication

The Defendant claims that the trial court erred by excluding evidence that Ms. Terrell was selling marijuana in the weeks prior to the shooting and evidence that she was possibly intoxicated at the time of the shooting. The Defendant contends that evidence of her drug sales was relevant to show a third party could have committed the crimes and that evidence of her possible intoxication was admissible to challenge her ability to identify him as the shooter. The State argues that the trial court properly excluded the evidence. We agree with the State.

As stated previously, relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

## A. Drug Sales

On the first day of trial, the Defendant filed a motion to admit evidence that Ms. Terrell was engaged in selling marijuana in April 2021. In the motion, the Defendant stated that he had obtained messages from Ms. Terrell's Facebook and Instagram accounts during discovery and that the messages showed she communicated with several people in which she arranged to sell them marijuana. The Defendant asserted that drug dealing was an inherently dangerous activity and, therefore, that evidence of selling marijuana was relevant to show a third party had a motive to harm Ms. Terrell.

During a jury-out hearing, Detective Morgan testified that as part of his investigation, he subpoenaed Ms. Terrell's Facebook and Instagram records. He acknowledged that according to the records, Ms. Terrell had conversations with several people in March and April 2021 in which she arranged to sell them marijuana. Ms. Terrell sometimes provided her address to customers. Defense counsel proffered fifteen pages of Ms. Terrell's Instagram and Facebook messages into evidence.

The trial court stated that "it's not a direct connection test. It's just a relevancy test." The trial court asked defense counsel, "Who is your third-party suspect?" Defense counsel responded, "The people that are in these records that are getting her address and know she's a drug dealer." Defense counsel acknowledged that he did not have any specific proof of threats against Ms. Terrell but asserted:

> Everyone here knows . . . that dealing in drugs is a dangerous trait. It is illegal and part of that is just for the safety of the community as a whole because guns and money and everything else don't mix. . . . I don't care whether she is a bad person, I don't care. . . . She's letting people come over to her place where -- to conduct drug transactions. That, in and of itself, per se is dangerous and raises the specter that there are other people out there with motives.

The trial court ruled as follows:

> So it's probative of, maybe somebody else did it, one of those unknown people. But then when you get to, does what you're offering really prove that? The answer, in my opinion, is no under 403 because it's just speculation. It's not relevant to just stand up and say, well, anybody that deals drugs I'm going to introduce proof that they are a drug dealer. So therefore, some customer may have shot them. So I think it's confusing, misleading the jury and mere speculation as these cases talk about.

- 28 -

In *Powers*, our supreme court articulated the standard for determining the admissibility of evidence for a third-party defense. The court rejected the "direct connection" test in which the evidence must "directly connect the third party with the substance of the crime and must clearly point out someone besides the accused as the guilty person in order to be admissible." *Id.* at 395. Instead, our supreme court held that the Rules of Evidence are sufficient to determine the admissibility of evidence regarding a third party's culpability and proceeded to address the admissibility of the proffered evidence under the general relevancy standards of Tennessee Rules of Evidence 401 and 403. *See id.* at 395-97.

The Defendant contends that although the trial court accurately stated the *Powers* standard for determining the admissibility of evidence for a third-party defense, the trial court placed great weight on the fact that the Defendant could not identify a specific alternative suspect, which was exactly the reasoning *Powers* rejected. We conclude that the trial court did not abuse its discretion. The records showed that Ms. Terrell was selling marijuana, but the records did not show, or even suggest, that the shooting was related to those drug sales or to Ms. Terrell's selling marijuana in general. Nothing in the proffered records showed that there was any animosity between Ms. Terrell and her customers or that the shooting related to a robbery. Therefore, the trial court did not err by concluding that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

## B. Possible Intoxication

During trial, the Defendant requested to introduce evidence that Ms. Terrell used marijuana prior to the shooting, which would have influenced her perception of the shooter. In an offer of proof to determine whether such evidence was admissible, Dr. Carney testified that medical personnel collected blood from Ms. Terrell while she was in the hospital but that toxicology tests were not performed on her blood samples. Drug screens were conducted on Ms. Terrell's baby on April 29. The baby's urine was positive for carboxy-THC, an inactive metabolite of marijuana, but the baby's blood was negative for THC. Dr. Carney stated that the positive urine test but negative blood test could be explained because the metabolite had passed through the baby's blood but was still in her urine. The trial court asked if Dr. Carney could determine when Ms. Terrell last used marijuana, and Dr. Carney answered, "Probably not. I can't narrow that down. I mean, we could be talking hours, we could be talking maybe even days potentially if this is all inactive metabolite." The trial court asked if Ms. Terrell used marijuana within twenty-four hours of her baby's blood draw, and Dr. Carney stated, "I guess it's possible, but it could be older."

Defense counsel argued that Ms. Terrell's use of marijuana within hours or days of the shooting was relevant to challenge Ms. Terrell's ability to perceive the facts and identify the shooter. The trial court ruled that although the evidence showed Ms. Terrell ingested THC, the evidence did not show when she ingested the drug and would be confusing to the jury. The trial court stated that it would reconsider the issue if the Defendant wanted to recall Ms. Terrell's mother or Mr. Stewart to the stand and present "valid legitimate proof" that Ms. Terrell was under the influence of marijuana at the time of the shooting.

Again, we conclude that the trial court did not abuse its discretion by excluding the evidence. Dr. Carney could not say when Ms. Terrell last used marijuana, and the Defendant did not proffer any evidence that she was under the influence of the drug at the time of the crimes. We note that Ms. Terrell was able to answer Officer Latham's questions accurately and even provided her mother's telephone number to Ms. Calil. The Defendant is not entitled to relief on this issue.

## VII. Cumulative Error

Finally, the Defendant claims that he should receive a new trial under the cumulative error doctrine. The cumulative error doctrine is

> a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). We have determined that the trial court erred by failing to instruct the jury on dying declarations and that the affidavit in support of the search warrant for the Defendant's Facebook account did not establish probable cause for the warrant. However, we conclude that, in light of the overwhelming evidence against the Defendant, the cumulative effect of those two errors does not require reversal of the Defendant's convictions.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE